CBS INC., Petitioner,

v.

The Honorable Don J. YOUNG, Judge, United States District Court, Northern District of Ohio, Respondent.

No. 75–1646.

United States Court of Appeals, Sixth Circuit.

July 2, 1975.

Rehearing and Rehearing En Banc Denied Aug. 14, 1975.

James P. Garner, H. Stephen Madsen, Donald A. Burns, Baker, Hostetler & Patterson, Cleveland, Ohio, Eleanor S. Applewhaite, New York City, Clyde R. Ellis, ACLU of Ohio Foundation, Inc., Columbus, Ohio, Steven A. Sindell, Nelson G. Karl, David E. Engdahl, Joseph Kelner, Cleveland, Ohio, for petitioner.

Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, John G. Mattimoe, Duane Stranahan, Jr., Donald F. Melhorn, Jr., Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, Robert H. Olson, Jr., Columbus, Ohio, Burt J. Fulton, Hauxhurst, Sharp, Mollison & Gallagher, Cleveland, Ohio, Charles E. Brown, Crabbe, Brown, Jones, Potts & Schmidt, R. Brooke Alloway, Topper, Alloway, Goodman, DeLeone & Duffey, Columbus, Robert W. Blakemore, Blakemore, Rosen & Norris, Akron, Ohio, for respondent.

**236**

E. Barrett Prettyman, Jr., Washington, D. C., Jack Landau, Reporters Committee for Freedom of the Press, Washington, D. C., amicus curiae.

Before MILLER, LIVELY and ENGEL, Circuit Judges.

PER CURIAM.

CBS Inc. has filed with this Court a petition for the writ of mandamus directed to the respondent, a duly appointed and acting United States District Court Judge for the Northern District of Ohio, to require him to vacate an order of May 6, 1975, entered in a civil action presently pending before him in Cleveland, Ohio, styled *Krause v. Rhodes,* bearing case # C70–544. The challenged order of May 6, 1975, reads:

For good cause appearing, it is

ORDERED that in addition to all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates are hereby ORDERED to refrain from discussing in any manner whatsoever these cases with members of the news media or the public.

The civil action arose from an occurrence of May 4, 1970, at Kent State University, when members of the Ohio National Guard were called to the campus of the University because of a demonstration on the part of a large number of students protesting the invasion of Cambodia by American troops. At some point after the Guard arrived on the campus, a confrontation between students and Guard members occurred, resulting in some members of the Guard firing their weapons, thereby causing the deaths of four students and the wounding of a number of others. Numerous civil actions on account of personal injuries were instituted in the district court against the Governor of the State of Ohio, the former Adjutant General, his former Attorney General, the former President of Kent State University, and a number of individual members of the National Guard. Wrongful death actions on behalf of the slain students were also filed against the same defendants. All actions were consolidated for trial under the style of *Krause v. Rhodes.* Damages were sought in the consolidated actions aggregating $48,000,000.00.

CBS is a New York corporation, operating a network of approximately 209 independently owned and five CBS owned television stations located in 47 states and the District of Columbia, one of which is located in Cleveland, Ohio. It also operates a network of approximately 246 independently owned radio stations located in the continental United States, including an AM radio station in Cleveland, Ohio. It owns and operates seven AM and seven FM radio stations in the United States, and produces news and public affairs programming for the radio and television networks.

The validity of the order is challenged by CBS on numerous grounds, principally its alleged violation of the rights of petitioner guaranteed by the First Amendment to the Constitution of the United States.

Because of the nature of the case, the Court was of the opinion that the issues raised by the petition for mandamus should not be determined summarily or without the benefit of responses from the interested parties. Accordingly, this Court entered its order on June 11, 1975, permitting the respondent, as well as all parties to the civil litigation, to file their answers to the petition together with briefs in support of their respective positions. In addition, the Court set the case down for oral argument on June 20, 1975. The same order permitted petitioner and respondent, and any party to the civil action, to present testimony in open court in addition to pertinent exhibits and affidavits. In consequence, the Court has had the benefit of oral arguments and extensive briefs on behalf of the petitioner and the respondent, in addition to extensive briefs filed by the following as amici curiae: The Reporters Committee for Freedom of the Press, Messrs. Anthony Nattalli and Joseph Mosbrook, news reporters currently

assigned to continuous daily coverage of the trial, and Local 1, The Newspaper Guild, representing approximately 800 news reporters and employees of news organizations in the Cleveland, Ohio, area.

## JURISDICTION

The petitioner invokes the jurisdiction of this Court to issue a writ of mandamus upon the All Writs Statute, 28 U.S.C. Sec. 1651. The respondent, on the other hand, challenges the jurisdiction of the Court to issue the writ in the context of the present case, arguing that no exceptional circumstances exist justifying the issuance by this Court of the extraordinary writ of mandamus.

■ We are of the opinion, however, that the circumstances presented are exceptional and that the Court has jurisdiction to issue the writ under the All Writs Statute. Jurisdiction, we feel, is fully sustained by our recent decision in *United States v. United States District Court for the Eastern District of Michigan,* 444 F.2d 651 (1971), *affd.,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), in which it was held that mandamus would lie to review an order of a United States District Judge which directed the United States to make full disclosure of certain conversations which had been monitored by the government, without judicial sanction, under the authority of the Omnibus Crime Bill. It was pointed out that mandamus was the proper remedy since the order was not appealable and the case was an extraordinary one, posing a basic issue under the Fourth Amendment. *See also Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

The petitioner, being neither a party to the litigation nor specifically enjoined by the order from discussing the case, *cf. United States v. Schiavo,* 504 F.2d 1 (3d Cir. 1974), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974), was not in position to seek a remedy by direct appeal to this Court. As we are nevertheless of the opinion, as set forth below, that the petitioner's First Amendment

rights were impaired and curtailed by the order, it would be without remedy should we find that the writ of mandamus could not be invoked. We find that the case is an extraordinary one, involving a basic issue, and that our authority to review the order in question by mandamus is unassailable.

## STANDING

The respondent argues that the petitioner lacks standing to apply for mandamus or to question the validity of the order. Although the petitioner was not made a specific target of the restrictive order enjoining discussions about the case, it was, in our view, nevertheless effectively cut off from any access whatever to important sources of information about the trial.

■■ The doctrine of standing is well established and has been employed in many instances as a device to deny litigants access to the courts. The Supreme Court in *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), enunciated the requirements for a party to have standing. The first requirement, as the Court stated, is that the plaintiff must allege that the challenged action has caused him injury in fact, economic or otherwise. That petitioner has satisfied this prong of the test is clear from the petition and from the face of the order itself, as already pointed out. The second requirement as set forth in *Data Processing* is that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." This aspect of the *Data Processing* test is also satisfied here. This is true because the order of May 6, in denying to petitioner access to potential sources of information, at least arguably impairs rights guaranteed to the petitioner by the First Amendment. We are not persuaded by the argument that petitioner lacks standing because it is not a party to the civil litigation. The fact remains that its ability to gather the news concerning the trial is directly

impaired or curtailed. The protected right to publish the news would be of little value in the absence of sources from which to obtain it. This was recognized by the Supreme Court in *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972), where the Court stated: "Without some protection for seeking out the news, freedom of the press could be eviscerated." News gathering thus qualifies for First Amendment protections. *See Branzburg* at 681 and 707, 92 S.Ct. 2646.

Thus, though CBS was not named in the order, *cf. Times Picayune Publishing Corp. v. Schulingkamp,* 419 U.S. 1301, 95 S.Ct. 1, 42 L.Ed.2d 17 (1974), nevertheless, as applied to CBS, this order affected its constitutionally guaranteed right as a member of the press to gather news.

It is axiomatic that the First Amendment guarantee of freedom of the press is for the benefit of all the people and not a device to give the press a favored status in society. In *Grosjean v. American Press Co.,* 297 U.S. 233, 249, 56 S.Ct. 444, 80 L.Ed. 660 (1930), the Court quoted from 2 Cooley's Constitutional Limitations, 8th ed., p. 886 as follows:

> The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.

We hold, therefore, that the petitioner has standing to maintain the present action and to challenge the validity of the restrictive order entered by the district court.

## THE VALIDITY OF THE MAY 6 ORDER

In a long series of cases the Supreme Court has made it clear that prior direct restraints by government upon First Amendment freedoms of expression and speech must be subjected by the courts to the closest scrutiny. *See generally Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). This principle has been expressed by the Supreme Court in a variety of ways. To justify imposition of a prior restraint, the activity restrained must pose a clear and present danger, or a serious or imminent threat to a protected competing interest. *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), and *Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). A system of prior restraints of expression bears a heavy presumption against its constitutional validity. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Southeastern Promotions, Ltd. v. Conrad, supra.* Hence, the government carries a heavy burden of showing a justification for its imposition. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); and *see New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The restraint must be narrowly drawn and cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms. *Carroll v. President & Commissioners of Princess Anne,* 393 U.S. 175, 183, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

In *Chase v. Robson,* 435 F.2d 1059 (1970), the Court of Appeals for the Seventh Circuit ordered the issuance of a writ of mandamus directing the district court to vacate its order in a pending criminal case which read as follows:

> It is further ordered that counsel for both the Government and the defendants, as well as each and every defendant herein, make or issue no statements, written or oral, either at a public meeting or occasion, or for public reporting or dissemination in any fashion, regarding the jury or jurors in this case, prospective or selected, the merits of the case, the evidence, actual

or anticipated, the witnesses, or the rulings of the court. This order shall remain in force during the pendency of this action in this court. No person covered by this order shall avoid its proscriptions by actions which indirectly, but deliberately, cause a violation of this order. Violation of this order subjects the transgressor to appropriate sanctions by the court. At 1060.

The trial in which the order was entered was one which had received considerable publicity as in the present case. The Court rationalized its result as follows:

> We hold that before a trial can limit defendants' and their attorneys' exercise of first amendment rights of freedom of speech, the record must contain sufficient specific findings by the trial court establishing that defendants' and their attorneys' conduct is "a serious and imminent threat to the administration of justice." *Craig v. Harney,* 331 U.S. 367, 373, 67 S.Ct. 1249, 1253, 91 L.Ed. 1546 (1947). Applying either the standard that the speech must create a "clear and present danger," *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), of a serious and imminent threat to the administration of justice, or the lesser standard that there must be a "reasonable likelihood," *United States v. Tijerina,* 412 F.2d 661 (10th Cir. 1969), of a serious and imminent threat to the administration of justice, we hold that the trial court's order is constitutionally impermissible. At 1061.

It is observable that the challenged order in *Chase,* although of considerable scope, was couched in much more specific terms than the order now under consideration. The court further expressed its ruling as follows:

> While we agree "[i]t is fundamental to our system of constitutional democracy that issues of law and fact in a criminal proceeding be resolved in the courts, and not in the news media nor in the streets," we believe equally fundamental to our system is the right of all citizens, even if they be criminal defendants to exercise their first amendment rights. In the absence of a clear showing that an exercise of those first amendment rights will interfere with the rights of the government and the defendants for a fair trial, we reject this prior restraint on first amendment freedoms. At 1061.

The holding in *Chase v. Robson* was reaffirmed by the Seventh Circuit in *In re Oliver,* 452 F.2d 111 (1971).

Examining the May 6 order in light of the principles enunciated in the cases cited above, we think the conclusion is inevitable that it constitutes a prior direct restraint upon freedom of expression. In sweeping terms it seals the lips of "all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends and associates . . . from discussing in any manner whatsoever these cases with members of the news media or the public." Although the news media are not directly enjoined from discussing the case, it is apparent that significant and meaningful sources of information concerning the case are effectively removed from them and their representatives. To that extent their protected right to obtain information concerning the trial is curtailed and impaired. *See Branzburg v. Hayes, supra.*

A more restrictive ban upon freedom of expression in the trial context would be difficult if not impossible to find. The order's restrictive and limiting character is only compounded when its vagueness and overbreadth are considered. For example, "relatives, close friends and associates" are given no definition with the result that a news reporter covering the trial would be at a loss to know with any degree of certainty what persons were embraced by these terms. The order suffers equally from the infirmity of overbreadth as to the subject matter or content of any prohibited discussions. According to its literal terms no discussions whatever about the case are permitted by the persons upon whom the ban is placed—whether prejudicial or innocuous, whether subjective or objective, whether reportorial or in-

terpretive. We find the order to be an extreme example of a prior restraint upon freedom of speech and expression and one that cannot escape the proscriptions of the First Amendment, unless it is shown to have been required to obviate serious and imminent threats to the fairness and integrity of the trial. Admittedly, the civil trial of *Krause v. Rhodes* is one of public interest despite the fact that it arose from an occurrence which by this time, due to intensive publicity, is well known to the public.

In addition to the massive publicity concerning this episode, further publicity has been attracted to it by the criminal trial of certain members of the Ohio National Guard and proceedings on the appeal of *Krause v. Rhodes,* first to the Court of Appeals for the Sixth Circuit and then to the Supreme Court. The events which prompted the respondent to enter the May 6 order are set forth in his affidavit as follows:

> On May 4, 1975, with trial approaching, a memorial service was held on the Kent State University Campus which was addressed by persons who had been prominent in the anti-war movement. I did not maintain a complete file but copies of some newspaper stories concerning this memorial which came to my attention are attached hereto as Exhibits 1 and 2. I had on a prior occasion noted a story concerning one of the plaintiff's efforts to obtain contributions, a copy of which is attached hereto as Exhibit 3, and noted this plaintiff's picture in Exhibit 1.

> With this development, I became concerned over the possibility of publicity which would have an inflammatory effect on the prospective jurors. For the reasons stated in my letter to counsel of May 6, 1975, a copy of which is attached hereto as Exhibit 4, I entered the order in question on that date. Since the order only binds the parties and their privies, I felt that it was proper to direct my reasons to their counsel rather than spread them on the record. My letter, Exhibit 4, and a copy of the order were directed to all counsel.[1]

We have carefully examined the newspaper articles referred to in the respondent's affidavit and, for the most part, we find them to be innocuous. It is true that one of the articles refers to the fact that the Kent State incident was commemorated on the campus of the University on May 4, 1975. The articles further indicate that some 800 persons were present, including Senator Eugene McCarthy, Elizabeth McAlister Berrigan, and other anti-war activists. Another article refers to the fact that the victims of the 1970 Kent State University shootings had turned for the first time to the public for contributions to finance their lawsuits.

As stated by the respondent in his May 6, 1975 letter to the attorneys, these articles gave him much concern and as a result he found it necessary to enter the restrictive order. He makes it clear in the letter that he will not hesitate to enforce the order by contempt proceedings if any violations should occur. It is shown that approximately one week was required to impanel the jury and that only one juror was excused for cause by reason of having received a solicitation for funds. Otherwise, the impaneling of the jury appears to have been effected with comparatively little difficulty, although the parties did exhaust their preemptory challenges. We find no substantial evidence to justify the conclusion that a clear and imminent danger to the fair administration of justice existed because of publicity. The presumption against the constitutional validity of the order, in our judgment, has not been met or overcome. We find it necessary, therefore, to conclude that

---

1. The parties to the civil action made no objection to the order. In fact their position, indicated to us by answers and affidavits, is that the order was appropriate in the context of the case to protect the trial.

the order is constitutionally impermissible.[2]

It is true that the right to a fair trial, both in civil and criminal cases, is one of our most cherished values, and that a trial judge should have the authority to adopt reasonable measures to avoid injury to the parties by reason of prejudicial or inflammatory publicity. We do not depart from the principle stated long ago by Mr. Justice Oliver Wendell Holmes in *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907):

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

We are not unmindful of the sensitive nature of the trial, the public interest in it, and the heavy responsibility resting upon the district judge to take such reasonable measures as may be required by the circumstances to obviate the possibility of contamination of the trial process. We entertain no doubt that the respondent entered the order in the good faith belief that his duty required it because of the nature of the case itself, the parties connected with it, and the publicity which the trial would be likely to attract. Every trial judge is charged with the primary responsibility of ensuring that the judicial proceedings over which he presides are carried out with decorum and dispatch and thus has very broad discretion in ordering the day-to-day activities of his court. There seems to be implicit in some of the papers which the petitioner has filed in this action a feeling that the procedures and schedules of the court should be tailored to suit the convenience of the news media. While a reasonable degree of cooperation between the courts and the media is desirable, nothing contained in this per curiam should be construed as requiring the respondent to advise or confer with media representatives concerning the court's scheduling of the various steps and proceedings in the pending trial, or any other matter before the court. Yet, as the authorities demonstrate, any restrictive order involving a prior restraint upon First Amendment freedoms is presumptively void and may be upheld only on the basis of a clear showing that an exercise of First Amendment rights will interfere with the rights of the parties to a fair trial.

We have examined the principal authorities relied upon by the respondent and find them to be inapposite. In *Pell v. Procunier, Corrections Director,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court sustained a California regulation that the press and other media interviews with specifically requested inmates would not be permitted. This regulation followed a violent prison episode that prison officials attributed at least in part to free face-to-face prisoner/press interviews. The regulation was found to be justified because alternative means of communication remained open to the inmates, and because the press had the unrestricted opportunity to obtain information about the prison from other sources.

*Saxbe, Attorney General, v. Washington Post Company,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), is a companion case involving a policy statement of the Federal Bureau of Prisons, prohibiting personal interviews between newsmen and individually requested inmates of federal prisons. This regulation was held not to infringe First Amendment guarantees since it was merely a particularized application of the general rule that no one may enter the prison and designate an inmate whom he

---

2. We have been urged by amici curiae, both in their briefs and oral arguments, to enunciate a rule which would require that the news media should be given notice and an opportunity to be heard before a judge should be permitted to enter a restrictive order impinging upon rights protected by the First Amendment. We are not persuaded by this argument, first, because we deem the proposal to be unrealistic, and secondly, because we have been unable to find any authority to support it.

would like to visit, unless the prospective visitor is a lawyer, clergyman, relative or friend of the inmate.

In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court, in weighing First Amendment rights of the press against the right of grand juries to investigate criminal charges, held that a newspaper reporter was not relieved by the First Amendment from the duty that all citizens have to respond to a grand jury subpoena and answer questions relevant to a criminal investigation.

The respondent's reliance upon *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), is singularly misplaced. The civil trial of *Krause v. Rhodes* is a far cry from the circus atmosphere and massive prejudicial publicity which caused the Supreme Court to void on collateral attack the murder conviction of Sheppard. The Supreme Court in *Sheppard* emphasized the prejudicial and inflammatory nature of newspaper and other news media publicity. The court suggested that the "trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters. . . . " In contrast, the order here makes no effort to limit the ban on extrajudicial statements to matters which might prejudice the trial, but enjoins any discussions of the cases in any manner whatsoever by the persons or classes specified.

It is therefore ordered and adjudged that a writ of mandamus issue directing the respondent to vacate his order of May 6, 1975, issued in the case of *Krause v. Rhodes,* concerning discussions of the case by the parties and others with the news media and the public.

### ORDER

In this action the respondent, following this Court's opinion granting a writ of mandamus, filed a petition for rehearing with suggestion for rehearing en banc, pursuant to Rule 35(b) of the Federal Rules of Appellate Procedure. The majority of the members of the Court having voted against the petition for rehearing en banc, the petition was referred to the original panel for disposition.

Upon full consideration of the petition for rehearing, the original panel is of the opinion that it presents no matter and raises no issue not fully considered by the panel in its per curiam opinion;

It is therefore ordered and adjudged that the petition for rehearing with suggestion for rehearing en banc be and the same is hereby denied.

Of the Judges of this Court in regular active service, Judges Celebrezze and McCree were in favor of a rehearing en banc as suggested by the respondent. Judge McCree voted for a rehearing en banc because in his opinion the Court was without jurisdiction to entertain the petition for mandamus.