In re Lacie RUSSELL, Signe Waller, Mark Smith, Dale Sampson, Martha Nathan, Floris Cause, Paul Bermanzohn, Nelson Johnson, Thomas Clark, Frankie Powell, James Wrenn, Donald Pelles, Rand Manzella, Willena Cannon, Allen Blitz, Kate White, and Joyce Johnson, Petitioners.

No. 84–1018.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1984.

Decided Feb. 8, 1984.

Eugene R. Scheiman, William A. Brandt, Jr., New York City, P. Lewis Pitts, Jr., Daniel P. Sheehan, Washington, D.C., for plaintiffs.

James W. Clute, Washington, D.C., for respondent.

Before PHILLIPS and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

Petitioners, who have been selected as potential witnesses in a criminal proceeding brought by the United States under 18 U.S.C. § 245 against several alleged members of the Ku Klux Klan and Nazi Party, have filed this action for a writ of mandamus requiring the district judge presiding over the criminal proceeding to vacate his order of January 5, 1984, which, *inter alia,* prohibited "potential witness[es]" from discussing their proposed trial testimony with members of the media. Petitioners contend that the district judge's order (hereinafter gag order) amounts to an unconstitutional prior restraint of their right to free speech protected by the first amendment. Specifically, they argue that the gag order is unconstitutional because the district judge did not conduct an "evidentiary" hearing before entering the order or articulate specific factual findings as a basis for his decision; they also argue that the order is unconstitutionally overbroad and vague, and that it violates petitioners' rights of free association. On January 10, 1984, petitioners' motion to stay the district court's order pending appellate consideration of the mandamus petition was denied by a panel of this court, and the United States was directed to file a response to the petition by January 17, 1984. Having studied the briefs and considered the oral argument of counsel, we conclude that the January 5 order does not violate petitioners' first amendment rights and we therefore deny the petition for writ of mandamus.

I

This petition grows out of an order issued by Judge Thomas A. Flannery, who is currently presiding over a federal criminal prosecution in the Middle District of North Carolina brought against several alleged Ku Klux Klansmen and/or Nazi Party members for putative civil rights violations arising out of a shooting that occurred in Greensboro, North Carolina, on November 3, 1979, and that resulted in the deaths of five individuals. It is an understatement to say that the incident has generated a substantial amount of media attention and publicity. *See generally In re Greensboro News Co.,* 727 F.2d 1320 (4th Cir.1984).

Each petitioner in this case has received a notice from the Department of Justice that he or she may be required to testify in the criminal proceeding. Some of the witnesses were present at the incident in Greensboro and others are relatives of several of the individuals who were killed. Many of the petitioners are plaintiffs in two civil suits pending in federal court, one of which seeks damages and the other of which seeks the appointment of a special prosecutor to investigate allegations of a law enforcement conspiracy.

The gag order at issue in this case, as modified,[1] provides in pertinent part:

3. Any person who is a potential witness in this case, as defined in subparagraph (a) below, SHALL NOT make any extrajudicial statement that relates to, concerns, or discusses the testimony such potential witnesses may give in this case, *or* any of the parties or issues such potential witness expects or reasonably should expect to be involved in this case, *or* the events leading up to and culminating in the shooting incident at Everitt and Carver Streets in Greensboro, North Carolina, on November 3, 1979, *if* such statement is intended for dissemination by means of public communication.

On November 18, 1983, petitioners moved the district court to vacate the provision pertaining to witnesses in the October 6 order. After a hearing on December 21, 1983, the court on January 5, 1984, entered the above order.

---

[1]. The original order restraining witnesses from making extrajudicial statements was entered on May 13, 1983. On June 17, 1983, the *defendants* in the criminal proceeding moved for modification of the order. On October 6, 1983, Judge Flannery modified portions of the order and made it clear that witnesses were free to discuss the case with counsel for the defense and prosecution.

(a) A "potential witness" is a person who has been notified by the government or by defendants that he or she may be called to testify in this case, or any person who has actually testified in this case.

(b) Potential witnesses SHALL NOT conduct any interviews with the print or electronic media during which such potential witness makes any statement, orally or in writing, that is proscribed by this paragraph of this Order.

(c) An extrajudicial statement proscribed by this paragraph of this Order SHALL NOT be made by any potential witness if such potential witness *intends* such statement to be disseminated by means of public communication. This includes any proscribed statement by a potential witness to any third party whom such potential witness authorizes, intends, or expects to disseminate such statement by means of public communication.

(d) Nothing in this Order shall be deemed to prevent or interfere with the right of potential witnesses to discuss this case or any other case fully with counsel.

(e) Nothing in this Order shall be deemed to prevent or interfere with the right of any potential witness to testify in court or by way of court authorized depositions or interrogatories in connection with any other case about all events, issues and persons relevant to such case.

(f) Nothing in this Order shall be deemed to prevent potential witnesses from *privately* soliciting funds to aid in the prosecution or defense of any related case. During the course of such private solicitation, potential witnesses are free to discuss the events leading up to and following the Greensboro shootings, provided such discussions are not intended by potential witnesses to result in dissemination of proscribed statements by means of public communication. Potential witnesses are permitted, pursuant to such efforts to solicit funds, to send private letters to potential contributors, provided such potential contributors are in no way involved in this case.

In a ten-page memorandum accompanying this order, Judge Flannery explained the basis for his decision. After noting that the trial was "the subject of intense local and national publicity," he determined that the proscription of certain extrajudicial communications by prospective witnesses was necessary in order to protect the right of the defendants to a fair trial "based solely on admissible evidence." He concluded, based on the representations of petitioners' counsel, various documentary evidence (including press reports and published interviews with witnesses), and statements made in pleadings filed by petitioners' counsel, that petitioners' views were, while understandable, "directly contrary to the defendant's interests" and "highly prejudicial." After rejecting as infeasible the suggested alternative of a change of venue and considering the possibility of using only jury control measures, the district judge determined that it was necessary to confine the petitioners' public statements about the November 3 incident to the courtroom, even in the face of petitioners' admittedly weighty first amendment rights.

II

In *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the Supreme Court vacated, as violative of the first amendment, an order prohibiting the *media* from *publishing* or broadcasting accounts of certain confessions or admissions made by the accused in a murder trial. The Court pointed out that other measures could be taken by the trial judge to ensure that the defendant received a fair trial stating:

the measures a judge takes or fails to take to mitigate the effects of pretrial publicity—the measures described in *Sheppard [v. Maxwell]*—may well determine whether the defendant receives a trial consistent with the requirements of due process. *Id.* at 555, 96 S.Ct. at 2801.

In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Court outlined various "strong," but necessary measures by which a trial judge can ensure

the sixth amendment rights of a criminal defendant:

"Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, *the trial courts must take strong measures to ensure that the balance is never weighed against the accused.* Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case* until the threat abates, *or transfer it* to another county not so permeated with publicity. In addition, *sequestration of the jury* was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. *Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.* Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures."

*Nebraska Press,* 427 U.S. at 553–54, 96 S.Ct. at 2800 (quoting *Sheppard,* 384 U.S. at 362–63, 86 S.Ct. at 1522) (emphasis added by Court in *Nebraska Press*).[2]

**2.** We note, as did the Court in *Nebraska Press,* see 427 U.S. at 564 & n. 8, 96 S.Ct. at 2805 & n. 8, that professional studies have recommended that trial courts, in appropriate cases, should limit what witnesses may say to the public. *See American Bar Association Project on Stan-*

■ We think these decisions support Judge Flannery's order in this case. The tremendous publicity attending this trial, the potentially inflammatory and highly prejudicial statements that could reasonably be expected from petitioners (and had indeed been openly forecast by their counsel in proceedings before the trial judge), and the relative ineffectiveness of the considered alternatives, dictated the "strong measure" of suppressing the speech of potential witnesses to ensure a fair trial. *Accord Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 556 F.2d 706, 708 (4th Cir.1977) (affirming order prohibiting extrajudicial statements by witnesses), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978); *United States v. Tijerina,* 412 F.2d 661, 666–67 (10th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969).

■ Nor is the district court's order rendered unconstitutional because of the alleged lack of an "evidentiary hearing" or of specific, articulated findings. We believe that the evidence considered by Judge Flannery adequately supported his determination that there was a reasonable likelihood that the defendants would be denied a fair trial without proscribing certain of petitioners' extrajudicial statements. *See generally Martin,* 551 F.2d at 562 n. 3; *United States v. Tijerina,* 412 F.2d 661, 666 (10th Cir.1969) (gag order constitutionally permissible if reasonable likelihood of prejudice to fair trial); *Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 431 F.Supp. 1182, 1188–89 (D.S.C.), *aff'd in part and modified in part,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978). *Cf. Hirschkop v. Snead,* 594 F.2d 356, 370 (4th Cir.1979) (rule prohibiting certain extrajudicial statements of lawyers did not violate lawyers' right to free speech where

*dards for Criminal Justice, Fair Trial and Free Press* 68–73 (App. Draft 1968). *See also Revised Free Press-Fair Trial Guidelines of the Judicial Conference of the United States,* 87 F.R.D. 525, 529–30 (1980).

statements had "reasonable likelihood of prejudice to fair administration of justice").

As the Supreme Court noted in *Nebraska Press:*

> In assessing the probable extent of publicity, the trial judge had before him newspapers demonstrating that the crime had already drawn intensive news coverage, and the testimony of the County Judge, who had entered the initial restraining order based on the local and national attention the case had attracted. The District Judge was required to assess the probable publicity that would be given these shocking crimes prior to the time a jury was selected and sequestered. He then had to examine the probable nature of the publicity and determine how it would affect prospective jurors.
>
> Our review of the pretrial record persuades us that the trial judge was justified in concluding that there would be intense and pervasive pretrial publicity concerning this case. He could also reasonably conclude, based on common human experience, that publicity might impair the defendant's right to a fair trial.

427 U.S. at 562–63, 96 S.Ct. at 2804–05. We also conclude that the findings made by Judge Flannery are adequate to support the gag order, recognizing, as we must, the "necessity" of some "speculation" and the weighing of "factors unknown and unknowable" confronting a trial judge in such a situation. *See Nebraska Press,* 427 U.S. at 563, 96 S.Ct. at 2804 (trial judge's "conclusion as to the impact of such publicity on prospective jurors was of necessity speculative, dealing as he was with factors unknown and unknowable").

■ Finally, we reject petitioner's arguments that the order is vague and overbroad. We think the district judge acted well within constitutional limits of specificity in light of the difficult task of drafting an order that sufficiently protected the sixth amendment rights of defendants and at the same time did not unjustifiably trammel petitioners' protected speech activities. As the Court noted in *Nebraska Press,*

> The dilemma posed underscores how difficult it is for trial judges to predict what information will in fact undermine the impartiality of jurors, and the difficulty of drafting an order that will effectively keep prejudicial information from prospective jurors. When a restrictive order is sought, a court can anticipate only part of what will develop that may injure the accused. But information not so obviously prejudicial may emerge, and what may properly be published in these "gray zone" circumstances may not violate the restrictive order and yet be prejudicial.

427 U.S. at 566–67, 96 S.Ct. at 2806–07.

For the above reasons,[3] the petition for a writ of mandamus is denied.

DENIED.

---

**3.** We also find petitioners' claims relating to the abridgement of their associational rights to be without merit.